COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                    FORT
WORTH

 

 

                                        NO.
2-07-353-CV

 

 

MALCOLM
BARBER AND LEANN                                          APPELLANTS

BARBER

 

                                                   V.

 

WILLIAM
F. DEAN, M.D., MIKKO                                             APPELLEES

PETER TAURIAINEN, M.D.,
AND

CARDIOVASCULAR AND

THORACIC SURGICAL GROUP

OF WICHITA FALLS, P.A. 

 

                                              ------------

 

             FROM THE 30TH
DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  INTRODUCTION

 








In three issues, appellants Malcolm Barber and
Leann Barber appeal the trial court=s order
dismissing their health care liability claims against Appellees William F.
Dean, M.D., Mikko Peter Tauriainen, M.D., and Cardiovascular and Thoracic
Surgical Group of Wichita Falls, P.A. (ACTSG@).  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(b)
(Vernon Supp. 2009).  We will affirm in
part and reverse and remand in part.

                          II.  FACTUAL AND PROCEDURAL BACKGROUND

According to Appellants=
original petition and the expert report of Jeffrey Alan Wagner, M.D., M.B.A.,
in January 2004, Malcolm underwent a multivessel coronary artery bypass graft
procedure involving the harvesting of his left radial artery, left saphenous
vein, and left internal mammary artery. 
The surgery lasted over six hours. 
A Athree team approach@ was
utilized during the harvesting procedure, and all three harvests were performed
simultaneously.  Dr. Tauriainen performed
the harvest of the left internal mammary artery; Leo Mercer, M.D. performed the
harvest of the left saphenous vein; and Shellie Barnett-Wright, PA-C performed
the harvest of the left radial artery from Malcolm=s left
forearm.  Dr. Dean, who was present in
the operating room for a portion of Malcolm=s
surgical procedure, provided Amedical/surgical@
services to Malcolm.  Following the
harvesting, Malcolm=s left arm was Atucked@ by
anesthesiologist Robert Moss, M.D., assisted by a couple of nurses.








Following the bypass graft procedure, Malcolm
experienced difficulties with his left hand and arm, including pain, burning,
numbness, inability to grip, stiffness, stinging, swelling, and weakness.  He attempted to relieve these difficulties
through medical management and occupational therapy, but the treatments proved
to be unsuccessful.  An orthopedic
surgeon diagnosed Malcolm with a left ulnar nerve lesion and ulnar cubital
syndrome and recommended surgery to treat the conditions.  Surgery to relieve these conditions was
unsuccessful, and Malcolm continues to experience pain, weakness, grip
difficulties, and other problems with his left arm and hand.

Appellants sued Appellees and others[1]
alleging, among other things, that Malcolm=s
postsurgical problems were caused by Appellees=
negligence in failing to provide medical or surgical care regarding Malcolm=s left
upper extremity condition during and after the surgical procedures.  Throughout his report, Dr. Wagner
characterizes Appellees= conduct as a failure to provide
for the proper positioning and padding of Malcolm=s arms
and body to prevent perioperative peripheral neuropathies.  Appellants alleged both direct and vicarious
theories of liability against CTSG.  They
tendered Dr. Wagner=s expert report within 120 days
of suit.








Dr. Dean timely filed his objections to Dr.
Wagner=s report
on the following grounds:

(1) Dr. Wagner is not
qualified to render an opinion about the accepted and applicable standard of
care relevant to Appellants= claim; and

 

(2) the report fails to
sufficiently set forth (i) the applicable standard of care and (ii) how Dr.
Dean failed to meet that standard of care.

 

Dr. Tauriainen timely filed his objection to Dr. Wagner=s report
on the ground that Dr. Wagner, an anesthesiologist, is not qualified to render
an opinion about the standard of care applicable to a cardiovascular and
thoracic surgeon.  CTSG timely filed its
objections to Dr. Wagner=s report on the following
grounds:

(1) Dr. Wagner is not
qualified to render an opinion as to whether CTSG breached any applicable
standard of care; and

 

(2) the report is
insufficient to set forth (i) the applicable standard of care, (ii) how CTSG
breached the standard of care, and (iii) how CTSG=s alleged negligence
caused Malcolm=s alleged injuries.

 

Appellees also filed civil practice and remedies
code section 74.351(b) motions to dismiss. 
After a hearing on Appellees= objections
to Dr. Wagner=s report and motions to dismiss,
the trial court sustained Appellees=
objections and dismissed Appellants= claims
against Appellees with prejudice.[2]








III.  Standard of Review

We review a trial court=s order
on a motion to dismiss a health care liability claim for an abuse of
discretion.[3]
 Jernigan v. Langley, 195
S.W.3d 91, 93 (Tex. 2006).  A
trial court abuses its discretion if it acts in an arbitrary or unreasonable
manner or if it acts without reference to any guiding rules or principles.  Bowie Mem'l Hosp. v. Wright, 79
S.W.3d 48, 52 (Tex. 2002) (citing Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241B42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986)).  We may not
substitute our judgment for the trial court=s
judgment.  Id.  Nor can we determine that the trial court
abused its discretion merely because we would have decided the matter differently.  Downer, 701 S.W.2d at 242.

IV.  Expert Report Requirements and Standards








Civil practice and remedies code section 74.351
provides that, within 120 days of filing suit, a plaintiff must serve expert
reports for each physician or health care provider against whom a liability
claim is asserted.  Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(a).  An expert report is a written report by an
expert that provides a fair summary of the expert=s
opinions regarding the applicable standard of care, the manner in which the
care rendered by the physician or health care provider failed to meet the
standard, and the causal relationship between that failure and the injury,
harm, or damages claimed.  Id. ' 74.351(r)(6).  If a claimant timely furnishes an expert
report, a defendant may file a motion challenging the report=s
adequacy.  See id. ' 74.351(a),
(c), (l).  A trial court must
grant a motion to dismiss based on the alleged inadequacy of an expert report
only if it finds, after a hearing, Athat the
report does not represent an objective good faith effort to comply with the
definition of an expert report@ in the
statute.  Id. ' 74.351(l).








The information in the report does not have to
meet the same requirements as evidence offered in a summary judgment proceeding
or at trial, and the report need not marshal all the plaintiff=s proof,
but it must include the expert=s opinions
on each of the elements identified in the statuteCstandard
of care, breach, and causation.  Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 878B79 (Tex.
2001); Thomas v. Alford, 230 S.W.3d 853, 856 (Tex. App.CHouston
[14th Dist.] 2007, no pet.).  In
detailing these elements, the supreme court has made clear that an expert
report must provide enough information to fulfill two purposes if it is to
constitute a good faith effort:  the
report must (1) inform the defendant of the specific conduct the plaintiff has
called into question and (2) provide a basis for the trial court to conclude
that the plaintiff=s claims have merit.  Palacios, 46 S.W.3d at 879; Gray v.
CHCA Bayshore L.P., 189 S.W.3d 855, 859 (Tex. App.CHouston
[1st Dist.] 2006, no pet.).  A report
does not fulfill these two purposes if it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Palacios, 46 S.W.3d at 879.  In assessing the report=s
sufficiency, the trial court may not draw any inferences; it must rely
exclusively on the information contained within the report=s four
corners.  Bowie Mem=l Hosp., 79
S.W.3d at 52; Palacios, 46 S.W.3d at 878.

Regarding qualifications, the civil practice and
remedies code provides in relevant part that Aexpert@ means
the following:

(A)    with
respect to a person giving opinion testimony regarding whether a physician departed
from accepted standards of medical care, an expert qualified to testify under
the requirements of Section 74.401;

 

(B)    with
respect to a person giving opinion testimony regarding whether a health care
provider departed from accepted standards of health care, an expert qualified
to testify under the requirements of Section 74.402; [and]

 








(C)    with
respect to a person giving opinion testimony about the causal relationship
between the injury, harm, or damages claimed and the alleged departure from the
applicable standard of care in any health care liability claim, a physician who
is otherwise qualified to render opinions on such causal relationship under the
Texas Rules of Evidence.

 

Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(5)(A)B(C).

Under section 74.401, a person may qualify as an
expert witness on the issue of whether a physician departed from accepted
standards of medical care only if the person is a physician who

(1) is practicing
medicine at the time such testimony is given or was practicing medicine at the
time the claim arose;

 

(2) has knowledge of
accepted standards of medical care for the diagnosis, care, or treatment of the
illness, injury, or condition involved in the claim; and

 

(3) is qualified on
the basis of training or experience to offer an expert opinion regarding those
accepted standards of medical care.

 

Id. ' 74.401(a)
(Vernon 2005).  In determining whether a
witness is qualified on the basis of training or experience under section
74.401(a)(3), the court shall consider whether, at the time the claim arose or
at the time the testimony is given, the witness (1) is board certified or
has other substantial training or experience in an area of medical practice
relevant to the claim and (2) is actively practicing medicine in rendering
medical care services relevant to the claim. 
Id. ' 74.401(c).








Under section 74.402, a person may qualify as an
expert witness on the issue of whether a health care provider departed from
accepted standards of care only if the person

(1) is practicing health
care in a field of practice that involves the same type of care or treatment as
that delivered by the defendant health care provider, if the defendant health
care provider is an individual, at the time the testimony is given or was
practicing that type of health care at the time the claim arose;

 

(2) has knowledge of
accepted standards of care for health care providers for the diagnosis, care,
or treatment of the illness, injury, or condition involved in the claim; and

 

(3) is qualified on the
basis of training or experience to offer an expert opinion regarding those
accepted standards of health care.

 

Id. ' 74.402(b)
(Vernon 2005).  In determining whether a
witness is qualified on the basis of training or experience under section
74.402(b)(3), the court shall consider whether, at the time the claim arose or
at the time the testimony is given, the witness (1) is certified by a licensing
agency of one or more states of the United States or a national professional
certifying agency, or has other substantial training or experience, in the area
of health care relevant to the claim and (2) is actively practicing health care
in rendering health care related services relevant to the claim.  Id. ' 74.402(c).








Under rule of evidence 702, A[w]hat
is required is that the offering party establish that the expert has >knowledge,
skill, experience, training, or education=
regarding the specific issue before the court which would qualify the expert to
give an opinion on that particular subject.@  Broders v. Heise, 924 S.W.2d 148, 153
(Tex. 1996); see also Tex. Civ. Prac. & Rem. Code Ann. ' 74.403
(Vernon 2005).

V.  Dr. Wagner=s
Qualifications

In their second issue, Appellants argue that the
trial court abused its discretion by ruling that Dr. Wagner is not qualified to
render an expert opinion as to whether Dr. Dean, Dr. Tauriainen, and CTSG
departed from accepted standards of medical care regarding the positioning
and padding of Malcolm=s arm during
the January 2004 multivessel coronary artery bypass graft procedure.

A.     Dr. Dean=s
Objection

Dr. Dean did not object in the trial court that
Dr. Wagner does not meet the criteria identified in section 74.401(a), (b), or
(c).  Instead, Dr. Dean based his
objection to Dr. Wagner=s qualifications on only one
ground, stating as follows:

[Dr.] Wagner=s curriculum vitae (ACV@) fails to show that he
has any training or experience as a cardiovascular surgeon.  Since Dr. Dean is a cardiovascular
surgeon, Dr. Wagner is not and cannot be familiar with the standard of care
applicable to a physician like or similar to Dr. Dean.

 








Dr. Dean=s objection to Dr. Wagner=s
qualifications is without merit for more than one reason.

In delineating the statutory qualifications for a
chapter 74 expert, the statute does not merely focus on the defendant physician=s area
of expertise but also on the condition involved in the claim.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.401(a)(2)
(requiring expert to have Aknowledge
of accepted standards of medical care for the diagnosis, care, or treatment of
the illness, injury, or condition involved in the claim@ (emphasis
added)), ' 74.401(c)(1), (2)
(recognizing an expert may be qualified on the basis of training or experience
if he or she is board certified or is practicing Ain an
area of medical practice relevant to the claim@
(emphasis added)).  That is, the
applicable Astandard of care@ and an
expert=s
ability to opine on it are dictated by the medical condition involved in the
claim and by the expert=s familiarity and experience
with that condition.  See Granbury
Minor Emergency Clinic v. Thiel, No. 02-08-00467-CV, 2009 WL
2751026, at *4 (Tex. App.CFort Worth Aug. 27, 2009, no
pet.); McKowen v. Ragston, 263 S.W.3d 157, 162 (Tex. App.CHouston
[1st Dist.] 2007, no pet.) (permitting infectious disease physician to opine on
standard of care for treating infection stemming from AV graft even though
defendant doctor was cardiothoracic surgeon); Blan v. Ali, 7 S.W.3d 741,
746B47 &
n.3 (Tex. App.CHouston [14th Dist.] 1999, no
pet.).








Here, according to Dr. Wagner=s
fourteen-page, single-spaced report, he specializes in anesthesiology and he
has substantial personal knowledge and experience in the care and treatment of
patients undergoing general anesthesia for cardiac surgical procedures.  He is also familiar with how such procedures
are managed.  Included in the management
of such procedures is the positioning and padding of the patient and the
patient=s
extremities.[4]  Appellants claim that Malcolm=s
postsurgical problems were caused by Appellees=
negligence in failing to provide for the proper positioning and padding of
his arm.  Thus, Dr. Wagner has
familiarity and experience with the specific medical condition involved in the
claim, which is the focus of chapter 74.








Further, though not every physician automatically
qualifies as an expert in every area of medicine, it is well established that a
physician need not be a practitioner in the same specialty as the defendant to
be qualified as an expert in a particular case. 
Broders, 924 S.W.2d at 152B53.  If a particular subject is substantially
developed in more than one medical field, a qualified physician in any of those
fields may testify.  Id. at 154; see
Rittger v. Danos, No. 01-08-00588-CV, 2009 WL 1688099, at *7 (Tex. App.CHouston
[1st Dist.] June 18, 2009, no pet. h.) (stating that when a particular subject
of inquiry is common to and equally developed in all fields of practice and the
prospective medical expert witness has practical knowledge of what is usually
and customarily done by a practitioner under circumstances similar to those
that confronted the practitioner charged with malpractice, the witness is
qualified to testify).








Here, the proper positioning and padding of
Malcolm=s arm during
the cardiac surgical procedure is not a subject exclusively within the
knowledge or experience of a physician specializing in cardiovascular or
thoracic surgery because Dr. Wagner, a physician who specializes in
anesthesiology, is experienced in and familiar with how cardiac surgical
proceduresCincluding the positioning and
padding of patients= extremitiesCare
managed.  Contrary to Dr. Dean=s
objection, Dr. Wagner=s specialization in the field of
anesthesiology instead of cardiovascular or thoracic surgery does not
disqualify him from rendering an expert opinion as to whether Dr. Dean departed
from accepted standards of medical care regarding the proper positioning and
padding of Malcolm=s arm.[5]  See Broders, 924 S.W.2d at 153B54.  We hold that the trial court abused its
discretion by ruling that Dr. Wagner is not qualified to render an expert
opinion as to whether Dr. Dean departed from the accepted standards of medical
care regarding the positioning and padding of Malcolm=s arm.  We sustain this part of Appellants= second
issue.

B.     Dr. Tauriainen=s
Objection

Dr. Tauriainen made the following objection in
the trial court to Dr. Wagner=s
qualifications:

[Dr. Tauriainen] objects
to the qualifications of Dr. Wagner for the reason that they fail to meet the
criteria, delineated in ' 74.401(a), (b) and
(c), that would permit him to offer expert testimony on the issue of whether
Dr. Tauriainen departed from the accepted standards of medical care in this
matter.

 

Dr. Wagner=s report satisfies each of the
section 74.401(a) requirements.








Dr. Wagner has been actively engaged in the
practice of medicine from 1982 to the present, and he was practicing medicine
as of the date of the report and when the claim arose in January 2004.[6]  Dr. Wagner thus satisfies the
requirement of civil practice and remedies code section 74.401(a)(1).








As mentioned above, Dr. Wagner states that
he has substantial personal knowledge and experience in the care and treatment
of patients undergoing general anesthesia for cardiac surgical procedures.  He is also familiar with the management of
such procedures, which includes positioning and padding patients and patients=
extremities in order to prevent perioperative peripheral neuropathies.  Dr. Wagner consequently states that he
has substantial knowledge of the reasonable, prudent, and accepted standards
of care applicable to cardiovascular and cardiothoracic surgeons, general
and traumatic surgeons, registered nurses, and physician assistants, among
others, for Athe diagnosis, assessment, care,
and treatment of patients undergoing general anesthesia for cardiac surgical
procedures,@ which includes the positioning
and padding of the patient and the patient=s
extremities in order to prevent perioperative peripheral neuropathies.  Dr. Wagner=s
knowledge of the applicable standards of care is based upon the following:

(1) his education,
training, and experience;

 

(2) his familiarity
with applicable medical literature;

 

(3) his familiarity
with the applicable standards of medical and health care developed among
anesthesiologists, cardiovascular and cardiothoracic surgeons, general and
traumatic surgeons, nurses, and physician assistants in the positioning and
padding of patients and the patients= extremities for the prevention of perioperative
peripheral neuropathies under circumstances like Malcolm=s;

 

(4) his familiarity
with the minimum standards of reasonable, prudent, and accepted medical
practices for the assessment, care, and treatment of surgical patients like or
similar to Malcolm regarding the prevention of perioperative peripheral neuropathies;
and

 

(5) his familiarity
with the standards of reasonable, prudent, and accepted standards of medical
care and treatment of surgical patients like Malcolm regarding the prevention
of perioperative peripheral neuropathies that were applicable to all
cardiovascular and thoracic surgeons, general or traumatic surgeons, nurses,
and physician assistants as of 2004.

 

In light of his substantial knowledge of the reasonable, prudent, and
accepted standards of care for Malcolm=s
condition, Dr. Wagner demonstrated that he Ahas
knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim,@ as
mandated by civil practice and remedies code section 74.401(a)(2).  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.401(a)(2).








As for the section 74.401(a)(3) requirement,
Dr. Wagner states in his report that he became board certified in
anesthesiology in 1985.  He has been a
Diplomate and Consultant to the American Board of Anesthesia since 1985 and a
Diplomate to the National Board of Medical Examiners since 1982.  Dr. Wagner=s
certification is relevant to Appellants= claim
because Dr. Wagner is experienced in and familiar with how cardiac
surgical procedures, including the proper positioning and padding of a patient=s
extremities, are managed.  See id.
' 74.401(c)(1).








Additionally, Dr. Wagner states that since
1982, he has administered and managed medical anesthesia care and treatment to
over 10,000 patients undergoing surgeries in a supine position and to between
300 and 400 patients undergoing cardiac surgery.  He also states that he has Aextensive
experience working cooperatively with nurses and physician[] assistants in the
nursing and physician assistant care and treatment of patients undergoing
general anesthesia for cardiac surgical procedures.@  Further, Dr. Wagner states that he has
substantial knowledge of the causal relationship regarding an anesthesiologist=s,
cardiovascular and cardiothoracic surgeon=s, and
physician assistant=s failures to meet the
reasonable, prudent, and accepted standards of care and supervision in the
diagnosis, care, and treatment of patients undergoing general anesthesia for
cardiac surgical procedures.  In light of
Dr. Wagner=s substantial relevant
experience, he has Aother substantial training or
experience in an area of medical practice relevant to@
Appellants= claim.  See id.

In considering section 74.401(c)(2),
Dr. Wagner has specialized in the field of anesthesiology since 1983 and
is actively engaged in the practice of medicine as the term is defined in
section 74.401.  We have already
explained that Dr. Wagner=s practice of anesthesiology is
relevant to Appellants= claim.  Thus, Dr. Wagner is actively practicing
medicine in rendering medical care services relevant to Appellants= claim. See
id. ' 74.401(c)(2).  Accordingly, considering that Dr. Wagner is
board certified or has other substantial training or experience in an area of
medical practice relevant to the claim and that he is actively practicing
medicine in rendering medical care services relevant to the claim, he showed
that he is Aqualified on the basis of
training and experience to offer an expert opinion regarding@ the
accepted and applicable standards of medical care in this case.  See id. ' 74.401(a)(3).








To the extent Dr. Tauriainen=s objection
based on section 74.401 implicates section 74.351(r)(5)(C), considering the
totality of Dr. Wagner=s
report, he has knowledge, skill, experience, training, or education that
qualifies him to give an opinion about whether Dr. Tauriainen=s
departure from accepted standards of medical care regarding the positioning and
padding of Malcolm=s arm before, during, and after
the surgical procedure had a causal relationship to Malcolm=s injury
because (1) he has substantial personal knowledge and experience in the
care and treatment of patients undergoing general anesthesia for cardiac
surgical procedures; (2) he has substantial knowledge of the reasonable,
prudent, and accepted standards of care applicable to cardiovascular and
cardiothoracic surgeons and other professionals for the care and treatment of
patients undergoing general anesthesia for cardiac surgical procedures;
(3) he has specialized in the field of anesthesiology since 1983 and has
been board certified in anesthesiology since 1985; and (4) he has
administered and managed medical anesthesia care and treatment to between 300
and 400 patients undergoing cardiac surgery. 
See Broders, 924 S.W.2d at 153. 
Dr. Wagner=s report establishes that he is
qualified to opine on the issue of causation because he is qualified to render
such an opinion under the rules of evidence. 
See Tex. Civ. Prac. & Rem. Code Ann. '' 74.351(r)(5)(C),
74.403(a).








Like Dr. Dean, Dr. Tauriainen argues that Dr.
Wagner is not qualified to address the accepted standard of care in this case
because he is an anesthesiologist, not a cardiovascular and thoracic
surgeon.  This argument is unpersuasive
for the same reasons that it was unpersuasive for Dr. Dean.  We hold that the trial court abused its
discretion by ruling that Dr. Wagner is not qualified to render an expert
opinion as to whether Dr. Tauriainen departed from the accepted standards of
medical care regarding the positioning and padding of Malcolm=s arm.  We sustain this part of Appellants= second
issue.

C.     CTSG=s
Objection

CTSG challenged Dr. Wagner=s
qualifications to render an expert opinion as to whether it departed from the
accepted standards of medical care relevant to Appellants=
claims.  Appellants alleged both direct
and vicarious theories of liability against CTSG.[7]  We construe CTSG=s
objection as a challenge to Dr. Wagner=s
qualifications to render an expert opinion as to CTSG=s direct
liability.[8]








As a professional association, CTSG is a Ahealth
care provider@ as defined by section
74.001.  Id. ' 74.001(a)(12)(A).  Thus, Dr. Wagner=s report
must demonstrate that he is qualified pursuant to section 74.402 to render an
expert opinion as to CTSG=s alleged departure from the
applicable standard of care.  See id.
' 74.351(r)(5)(B).  Unlike Dr. Wagner=s report
as to Dr. Dean and Dr. Tauriainen, Dr. Wagner=s report
as to CTSG does not provide any information regarding his background, training,
or experience from which it can be concluded that he has expertise about the
standards of care generally applicable to professional associations.  Dr. Wagner generally asserts that he is
qualified to render an expert opinion on CTSG=s
conduct, but this alone is insufficient in the absence of any information
within the report itself indicating any experience or training regarding the
standards of care applicable to professional associations.  We hold that the trial court did not abuse
its discretion by sustaining CTSG=s
objection that Dr. Wagner=s report failed to show that he
is qualified under section 74.402 to opine regarding Appellants= direct
liability claim against CTSG.  We
overrule this part of Appellants= second
issue.

VI.  Sufficiency of Dr. Wagner=s
Report








In their third issue, Appellants argue that the
trial court abused its discretion by ruling that Dr. Wagner=s report
is insufficient to represent an objective good faith effort to comply with the
definition of an expert report in section 74.351(r)(6).  Dr. Tauriainen did not object in the trial
court that Dr. Wagner=s report
was insufficient as to any of the section 74.351(r)(6) requirements.  But Dr. Dean objected that Dr. Wagner=s report
was insufficient regarding the applicable standard of care and how Dr. Dean
failed to meet that standard of care, and CTSG challenged each requirement of
section 74.351(r)(6).

A.     Standard of Care

Dr. Wagner states the following regarding the
accepted and applicable standards of care in this case:








The applicable
reasonable, prudent and accepted standards of care for . . . Dr. [Tauriainen]
[and] Dr. Dean . . . involved a shared responsibility on the part of each of
these surgeons, the physician assistant, and nurses to properly position and
pad [Malcolm=s] left and right upper
extremities before the start of the CABG surgical procedure, during the left
radial artery harvest, after the left radial [artery] harvest and during the
remainder of the surgery in order to prevent peripheral neuropathies to
[Malcolm=s] upper extremities.  Of the major nerves in the upper extremities,
the ulnar nerve and brachial plexus nerves are and were the most common nerves
to be at risk of injury and to become symptomatic and lead to major disability
of a patient during and after the perioperative period.  Improper surgical patient positioning and
padding of upper extremities were well known causative factors in the
development of surgical patients= ulnar neuropathies as of 2004 and such risks had
been known by the surgical, physician assistants, hospital, and operating room
nursing communities in the United States for many years.  As of 2004, reasonably prudent anesthesiologists,
cardiovascular and cardiothoracic surgeons, general and traumatic surgeons,
physician=s professional
associations, registered nurses, and physician[] assistants were or should have
been aware that surgical patients in supine positions were at risk of
developing ulnar nerve injuries and neuropathies during surgery due to external
ulnar nerve compression or stretching caused by malpositioning and improper or
inadequate padding during surgery.  Prevention
of perioperative peripheral neuropathies to [Malcolm], including his left upper
extremity, was preventable by proper positioning and padding of his left arm
and hand.  Dr. Moss, with the
cooperation of nurses Alexander and Syptak, should have positioned [Malcolm=s] right and left upper
extremities in a manner to decrease pressure on the postcondylar groove of the
humerus or ulnar groove.  When his arms
were tucked at the side the neutral forearm position with elbows padded would
have been appropriate.  When his left
upper extremity was abducted on an arm board, that extremity should have been
either in supination or a neutral forearm position.  His arm should have been extended to less
than ninety degrees.  They should have
applied padding materials such as foam sponges, eggcrate foam or gel pads, to
protect exposed peripheral nerves in [Malcolm=s] left arm, particularly
at the site of his elbow and left ulnar groove. 
Thus, after Drs. [Tauriainen] [and] Dean . . . harvested
[Malcolm=s] left radial artery
from his left upper extremity extended on an armboard, they, together with Dr.
Moss, and nurses Alexander and Syptak, should have assured that [Malcolm=s] left upper extremity
was returned to his side in a neutral forearm position and padding of his left
elbow and any bony prominences should have been performed to protect his left
ulnar nerve and prevent the risk of a left upper extremity neuropathy to the
nerve.  Also, Drs. [Tauriainen] and
Dean . . . should have assured and followed procedures so that
[Malcom=s] left upper extremity
was positioned in a neutral forearm position and properly padded to prevent the
risk that any of the surgeons or assistants could come in contact or lean on
his left arm during the surgical procedure. 
[Emphasis
added.]

 













The report thus includes Dr. Wagner=s
opinions on the element of standard of care. 
See id. ' 74.351(r)(6).  Dr. Dean and CTSG, however, cite Taylor v.
Christus Spohn Health System Corp., 169 S.W.3d 241 (Tex. App.CCorpus
Christi 2004, no pet.), and argue that Dr. Wagner=s report
is insufficient because it fails to state with specificity the applicable
standard of care for each defendant.  Taylor
has been thoroughly scrutinized by the appellate courts, and it does not
expressly prohibit applying the same standard of care to more than one health
care provider if they all owe the same duty to the patient.  See Springer v. Johnson, 280 S.W.3d
322, 332B33 (Tex.
App.CAmarillo
2008, no pet.); Livingston v. Montgomery, 279 S.W.3d 868, 871B73 (Tex.
App.CDallas 2009,
no pet.); Sanjar v. Turner, 252 S.W.3d 460, 466B67 (Tex.
App.CHouston
[14th Dist.] 2008, no pet.).  Dr. Wagner=s report
provides that Appellees all shared a responsibility to properly position
Malcolm=s
arm.  The report is not insufficient for Agrouping@
Appellees together because Dr. Wagner specifically states that they all owed
the same duty to ensure the proper positioning and padding of Malcolm=s
arm.  See Springer, 280
S.W.3d at 332; Livingston, 279 S.W.3d at 873; Sanjar, 252
S.W.3d at 466; In re Stacy K. Boone, 223 S.W.3d 398, 405B06 (Tex.
App.CAmarillo
2006, no pet.) (holding that a single standard of care applicable to physicians
and physician assistant was sufficient because all participated in
administering treatment); cf. Polone v. Shearer, 287 S.W.3d 229,
235 (Tex. App.CFort Worth 2009, no pet.)
(holding report that set forth single standard of care applicable to physician
and physician assistant insufficient to represent a good faith effort because A[a]lthough
the standards of care might be the same for both [the physician and physician
assistant], the report does not specifically state as much@).  We hold that Dr. Wagner=s report
constitutes a good faith effort to identify and set forth the applicable
standards of care in this case and that the trial court abused its discretion
by ruling otherwise.  We sustain this
part of Appellants= third issue.

B.     Breach of Standard of Care and Causation

Dr. Wagner=s report
states the following regarding how Appellees failed to meet the applicable
standards of care and the causal relationship between that failure and the
injury, harm, or damages claimed:








It is my opinion that Dr.
[Tauriainen] [and] Dr. Dean . . . failed to meet the applicable reasonable,
prudent and accepted standards of medical care . . . for each of them in that
they did not properly and adequately perform procedures to assure that [Malcolm=s] left upper extremity
was positioned and padded to decrease pressure on his left postcondylar groove
of the humerus or ulnar groove in order to protect him from a serious and
permanent left ulnar nerve injury and neuropathy to his left upper extremity.  During the surgery, [Malcolm] was asleep
under the effects of general anesthesia and he was unable to care for himself
and protect himself from a left upper extremity ulnar nerve injury and
neuropathy.  According to the hospital=s intraoperative
record[,] a left radial artery harvest was performed by Ms. Barnett-Wright,
under the supervision of Dr. [Tauriainen] and Dr. Dean.  After this harvest procedure, [Malcolm=s] right arm was placed
in a tucked and padded position on his right side, his left arm was placed on
an olympic table for the left radial artery harvest procedure, and then his
left arm was placed in a Atucked@ position on his left
side by Dr. Moss, with the cooperation of nurses Alexander and
Syptak.  Dr. [Tauriainen] [and] Dr.
Dean . . . had a shared responsibility with the anesthesiologist . . . to
assure that [Malcolm=s] left upper extremity was properly positioned
and padded for the remainder of the CABG surgery.  However, Dr. [Tauriainen] [and] Dr. Dean . .
. improperly failed to position [Malcolm=s] left arm and apply padding
or adequate padding such as foam sponges, eggcrate foam, or gel pads to protect
his exposed peripheral left ulnar nerve at the site of his elbow and left ulnar
groove.  Dr. [Tauriainen] [and]
Dr. Dean . . . should have directed Ms. Barnett-Wright to
place [Malcolm=s] left arm in a neutral
forearm position and apply padding of his left elbow to protect his left ulnar
nerve, and Dr. [Tauriainen] [and] Dr. Dean . . . should have checked the site
of [Malcolm=s] left arm and elbow to
assure that these procedures had been properly followed, or Dr. [Tauriainen]
[and] Dr. Dean should have performed these procedures themselves.  It appears from the hospital record that
Dr. [Tauriainen] [and] Dr. Dean . . . did not adequately direct Ms.
Barnett-Wright in the positioning and placement of [Malcolm=s] left arm to protect
his left ulnar nerve following the left radial artery harvest, and that they
did not adequately perform these procedures themselves nor assure that Ms.
Barnett-Wright had done so to protect [Malcolm=s] left ulnar nerve. . .
.  These standard of care failures by Dr.
[Tauriainen] [and] Dr. Dean . . . very likely resulted in the exposure of
[Malcolm=s] left ulnar peripheral
nerve to excessive external pressure or stretching, or both, over a prolonged
period of approximately four hours during the surgical procedure and this
prolonged pressure and/or stretching most likely resulted in a serious and
permanent left ulnar nerve injury and neuropathy to [Malcolm=s] left arm and hand, and
[Malcolm=s] physical impairments
in the use of his left hand consisting of pain, numbness, stiffness, impaired
use of his left hand and two fingers involved. 
My opinion in this regard is based upon the facts that [Malcolm] did not
have any preoperative history of left upper extremity neuropathy, the hospital
intraoperative records indicate that his left upper extremity was
inappropriately and inadequately positioned and padded during the surgery,
[and] he awoke from general anesthesia in the ICU and immediately perceived
painful throbbing, burning and swelling of his left arm and hand. . . .  If Dr. [Tauriainen] [and] Dr. Dean .
. . with the cooperation of Ms. Barnett-Wright, had properly positioned
and padded [Malcolm=s] left arm, and particularly the area of his
elbow and ulnar groove, his ulnar nerve would not have been exposed to
prolonged pressure throughout the remainder of the surgery, and in all
reasonable medical probability, he would not have suffered permanent left upper
extremity ulnar nerve injury and neuropathy for the reasons which I have
discussed above.  [Emphasis added.]

 








The report thus includes Dr. Wagner=s
opinions on the elements of the manner in which the care rendered by Appellees
failed to meet the applicable standards of care and the causal relationship
between that failure and the injury, harm, or damages claimed.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(r)(6).  The report also links Appellees=
purported breach of the applicable standards of care to Malcolm=s
alleged injuries.  See Bowie Mem=l Hosp., 79
S.W.3d at 52 (requiring expert to explain the basis of his statements regarding
causation and link his conclusions to the facts).  We hold that Dr. Wagner=s report
represents an objective good faith effort to identify and set forth how
Appellees breached the applicable standards of care and the causal relationship
between that failure and the injuries claimed. 
Dr. Wagner=s report indisputably informs
Appellees of the specific conduct Appellants have called into question and
provides a basis for the trial court to conclude that the Appellants= claims
have merit.  See Palacios, 46
S.W.3d at 879.  We hold that the trial
court=s ruling
otherwise was arbitrary or unreasonable, or without reference to any guiding
rules or principles, and, thus, an abuse of discretion.  We sustain the remainder of Appellants= third
issue.

VII.  Conclusion








Having overruled part of Appellants= second
issue, we affirm the part of the trial court=s order
sustaining CTSG=s objection that Dr. Wagner=s report
failed to show that he is qualified under section 74.402 to render an expert
opinion as to CTSG=s direct liability and
dismissing Appellants= direct liability claims against
CTSG.  Having sustained the remainder of
Appellants= second issue and all of their
third issue, we reverse the trial court=s order
sustaining each of Appellees= other
objections to Dr. Wagner=s report and dismissing
Appellants= claims against Dr. Dean and Dr.
Tauriainen and their vicarious liability claims against CTSG.  We remand the case to the trial court for
further proceedings.

 

 

BILL
MEIER

JUSTICE

 

PANEL:  CAYCE, C.J.; LIVINGSTON
and MEIER, JJ.

DELIVERED:  October 29, 2009











[1]The other defendants
included Dr. Mercer; Barnett-Wright; Dr. Moss, who placed Malcolm under general
anesthesia for the procedure; and United Regional Health Care System, Inc., the
hospital at which the surgery occurred. 
Dr. Mercer was the appellee in a separate appeal in which Appellants
challenged the trial court=s dismissal of their claim against
Dr. Mercer for failure to comply with the civil practice and remedies code
expert report requirements.  See
Barber v. Mercer, No. 02-08-00079-CV, 2009 WL 3337192 (Tex. App.CFort Worth Oct. 15, 2009,
no pet. h.).





[2]The trial court also
denied Appellants= request for a thirty-day
grace period to provide an amended expert report as to Appellees, but
Appellants have not appealed that portion of the trial court=s order.





[3]In their first issue in
this appeal, Appellants ask this court to conclude that abuse of discretion
continues to be the proper standard of review following the recodification of
the Texas Medical Liability Act in 2003. 
Appellees agree that the standard of review is abuse of discretion.  In the absence of supreme court authority
instructing otherwise, we have continued to apply the abuse of discretion
standard and do so here.  See, e.g.,
Maris v. Hendricks, 262 S.W.3d 379, 383 (Tex. App.CFort Worth 2008, pet.
denied).





[4]Dr. Wagner
additionally states, AAnesthesiology may also
be defined as continuity of patient care involving preoperative
evaluation, intra-operative and postoperative care and the management of
systems and personnel that support these activities.@ [Emphasis added.]





[5]To the extent Dr. Dean
argues that Dr. Wagner is not qualified to render an opinion for reasons other
than the ground addressed above, we do not consider those waived objections
because they were not raised in the trial court within twenty-one days after
the date Dr. Dean was served with Dr. Wagner=s report implicating Dr. Dean=s conduct.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(a); Maris,
262 S.W.3d at 384.





[6]According to
Dr. Wagner=s curriculum vitae, which
he fully incorporated by reference into his report, he has been the President
and Managing Partner of Anesthesia Associates since 1986, he was the
chairperson for the Department of Anesthesia at a Connecticut hospital, he was
on the faculty of the Yale School of Medicine, he was an Assistant Professor of
Anesthesia at the Yale School of Medicine, he was the CEO of Pain Therapy
Consultants, and he was the director of an intensive care unit at a Connecticut
hospital.





[7]Regarding Appellants= direct liability claims,
they alleged that CTSG negligently failed to supervise the quality of medical
and health services for Malcolm.





[8]To the extent CTSG
challenges Dr. Wagner=s report as to Appellants= allegations that CTSG is
vicariously liable for the actions and inactions of Dr. Tauriainen and
Dr. Dean, we have already ruled above that the report was sufficient to
demonstrate Dr. Wagner=s qualifications to
render an expert opinion as to Dr. Tauriainen and Dr. Dean.